UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHARON L. HILL,

              Plaintiff,        **No. 1:11-CV-0505(MAT)**
     - vs -               **DECISION AND ORDER**

MICHAEL J. ASTRUE, Commissioner
of Social Security,

              Defendant.
_____

## I.   Introduction

Sharon Hill ("Plaintiff"), represented by counsel, brings this action pursuant to Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("Defendant"), denying her application for Supplemental Security Income ("SSI"). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 12(c).

## II.   Procedural History

In her application for SSI filed on December 12, 2006, Plaintiff alleged disability due to hepatitis B, depression, and a learning disorder. T.80-83, 96-101.[1] The Commissioner initially denied the application. T.45-49. At Plaintiff's request, a hearing before an administrative law judge ("ALJ") was held on April 8, 2009. T.24-44. After considering Plaintiff's disability

---

[1]    Citations to "T.__" refer to pages in the administrative transcript filed by Defendant in connection with his answer to the complaint.

claim de novo, ALJ William Straub issued a written decision on June 18, 2009, finding that she retains the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy and, thus, she is not disabled. T.13-22. On April 14, 2011, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision. T. 1-3; 6-9.

**III. Summary of the Administrative Record**

   **A. Testimonial and Non-Medical Evidence**

   Plaintiff was thirty-eight years-old as of her SSI application date. In describing her activities of daily living ("ADLs"), Plaintiff stated that she lived alone, cooked her own meals, did the laundry and mopped the floors with help from her children, went out for walks and used public transportation, grocery shopped, occasionally watched television with her children, could follow spoken instructions, and did not have difficulties getting along with supervisors, teachers, and other authority figures. Plaintiff stated that she did not socialize and had no friends. She was unable to finish what she started, could not follow written instructions, and had memory problems. See T.107-14.

   At the administrative hearing, Plaintiff testified that she lived with her two sons and had graduated from Buffalo State

College ("BSC") with a bachelor's degree in 2006.[2] Plaintiff testified that she could not work at a regular fulltime job because she could barely get out of bed in the mornings. T.43. She explained that she was depressed because three relatives and one close friend had died within the last ten years. T.34. Plaintiff complained that she had difficulties sleeping and had nightmares about her troubled childhood. T.35, 42. Plaintiff described herself as very sad, and said that she cried every day. Plaintiff testified that she did not want to be around people, and did not want to do anything other than sleep all day. T.39, 40.

**B. Relevant Medical Evidence**

Plaintiff presented to Horizon Health Care ("Horizon") in October 2006, with complaints of depression, lack of energy, difficulty sleeping, and an inability to concentrate. See T.191-98. At the time, Plaintiff was a graduate student at Buffalo State College and was caring for three children on her own. Social worker Liana Martinez ("SW Martinez") assessed the following on the DSM-IV multiaxial scale[3]: major depressive

---

[2] The records indicate that while enrolled at BSC, Plaintiff was seen at the College Counseling Center on six occasions between April 2005, and October 2006, for "concerns related to . . . anxiety and stress which were negatively impacting on" her academic performance. T.157.

[3] The DSM-IV multiaxial scale assesses an individual's mental and physical condition on five axes, each of which refers to a different class of information. Axis I refers to clinical disorders; Axis II refers to personality disorders; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental problems; and Axis V cites the individual's global assessment of functioning. See Diagnostic and Statistical Manual of Mental Disorders-IV-TR ("DSM-IV"), 27 (4th ed. 2000).

disorder, single episode, not otherwise specified ("NOS") on Axis I, and a global assessment of functioning ("GAF") score of 50 on Axis V.[4] T.197.

Horizon staff psychiatrist Hak J. Ko, M.D., conducted an examination and completed an initial psychiatric assessment on October 27, 2006.   T.191. Dr. Ko observed that Plaintiff was extremely depressed and tearful with marked psychomotor retardation and slow responses. Her speech, although low-toned and unproductive, was rational. Plaintiff's affect was markedly depressed and tearful though she denied suicidal ideation, hallucinations, or paranoia. Plaintiff's memory was unimpaired and her IQ was average. Dr. Ko assessed major depression, single episode, rule out bipolar disorder on Axis I of the On the DSM-IV multiaxial scale. Dr. Ko assigned Plaintiff a GAF score of about 40 to 45 on Axis V,[5] which was less favorable than S.W. Martinez's estimate from an earlier appointment that month. Dr. Ko advised Plaintiff to take a medical leave from work and school, and to continue mental health counseling. Plaintiff was

---

[4]     A GAF in the range of 41 to 50 signifies serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., the individual has nohfriends, is unable to keep a job). See DSM-IV at 34 (4th ed. 2000).

[5]     A GAF score of 40 signifies an impairment in reality testing or communication (i.e., speech is sometimes illogical, obscure, or irrelevant), and a major impairment in several areas such as work, school, family relations, judgment, thinking, or mood (i.e., a depressed person avoids friends, neglects family, and is unable to work). See DSM-IV at 34.

treated with several medications for her depression and paranoia: hydroxyzine; sertaline; and quetiapine.[6]

On July 10, 2007, S.W. Martinez discharged Plaintiff from treatment at Horizon, due to "extremely poor attendance" at appointments. T.265. Plaintiff had last been seen on June 18, 2007, at which time S.W. Martinez diagnosed a major depressive disorder, single episode; and assessed a GAF score of 45. Id.

On March 30, 2007, Dr. Kathleen Kelley, a consultative physician, examined Plaintiff. Dr. Kelley found no physical limitations and diagnosed a history of sadness and headaches; hypertension, uncontrolled; and recent bronchitis or pleurisy. T.160.

Also on March 30, 2007, Plaintiff was examined by consultative psychologist Thomas Ryan, M.D. See T.162-65. Plaintiff told Dr. Ryan that she had no history of psychiatric hospitalization, but had seen a counselor twice a month and a psychiatrist once a month since October 2006. With regard to his mental status examination of Plaintiff, Dr. Ryan observed that Plaintiff's manner of relating, social skills, and overall presentation were poor due to cognitive limitations and depression. Plaintiff's mood was dysthymic and her affect, depressed. Her attention and concentration skills were intact,

---

[6] http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html; http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html; http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html.

but her recent and remote memory skills were impaired. Dr. Ryan evaluated Plaintiff's insight and judgment as somewhat poor. T.164.

According to Dr. Ryan, Plaintiff could follow and understand simple directions, perform simple tasks, maintain a regular schedule, and learn some new tasks. T.164. However, Dr. Ryan found, Plaintiff will have difficulty maintaining attention and concentration, performing complex tasks, dealing with others, and dealing with stress. T.164. On the Wide Range Achievement Test, Third Edition (WRAT-III), Plaintiff achieved a standard score of 72. T.167. On the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), Plaintiff scored a verbal IQ of 69, a performance IQ of 64, and a full-scale IQ of 64. T.168. Dr. Ryan noted that although Plaintiff's test scores indicated deficient functioning, she had expended only minimal effort in completing the tests. Id. Dr. Ryan suspected that her actual level of functioning was likely within the "borderline" range. T.164. Plaintiff's statements to Dr. Ryan concerning her activities of daily living were consonant with her hearing testimony. Dr. Ryan diagnosed a depressive disorder, NOS; and borderline intellectual functioning. T.164-65. Dr. Ryan stated that the "[r]esults of the evaluation are consistent with psychiatric and cognitive problems which interfere with her ability to function on a daily basis.

. . . [A]lthough she tested in the deficient range, it is felt that her depression interfered." T.164.

Dr. H. Tzetzo, a State agency psychiatric consultant, reviewed the medical evidence of record on April 24, 2007, and opined that Plaintiff's borderline intellectual functioning and depressive disorder did not meet the criteria in 20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 12.02 and 12.04. See T.218-21. Dr. Tzetzo assessed a mild restriction in Plaintiff's ability to perform activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. T.228. According to Dr. Tzetzo, Plaintiff had no significant limitations in understanding, remembering, and carrying out short and simple instructions, performing activities within a regular schedule, sustaining an ordinary routine without special supervision, completing a normal work week without interruptions from psychologically-based symptoms, asking simple questions or requesting assistance, and accepting instructions and responding appropriately to criticism from supervisors. T.232-33. She had moderate limitations in working in coordination with or proximity to others, interacting appropriately with the general public, getting along with co-workers or peers, maintaining socially appropriate behavior, and responding appropriately to changes in the work setting. Dr. Tzetzo opined

that Plaintiff would be able to understand and follow work directions in a work setting (with low public contact), maintain attention for such work tasks, relate adequately to a work supervisor, and use judgment to make work-related decisions. T.230.

From February 12, 2008, through May 6, 2009, Plaintiff was treated for depression marked by insomnia, headaches, and crying spells at Lake Shore Behavioral Health. T.290-426. During her intake appointment, Elizabeth Bianco, a mental health counselor ("Counselor Bianco") observed that Plaintiff was fully oriented though her mood was very depressed and her affect flat. T.292. Plaintiff's thought content was depressed, guilty, and preoccupied with negative ruminations. Her attention and concentration skills were intact, and her recent and remote memory skills were fair. Plaintiff's insight and judgment were poor. She denied visual/auditory hallucinations or delusions as well as suicidal ideation. T.290. Counselor Bianco diagnosed a depressive disorder, NOS, on Axis I; and a GAF score of 55 on Axis V.[7] T.294.

In July 2008, Plaintiff appeared for her appointment dressed in a sweatsuit and jacket although it was 80 degrees outside.

---

[7] A GAF score of 51 to 60 signifies some moderate symptoms (e.g., flat affect or occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends or conflicts with peers or co-workers). See DSM-IV at 34.

T.410.[8] Plaintiff told Counselor Bianco that she was "working odd jobs under the table" and trying to take care of herself. Plaintiff "showed no insight" into her options for handling problems with her housing situation and children, and repeatedly asserted that she felt responsible for everyone and felt overwhelmed and stressed out. Counselor Bianco noted that Plaintiff "appear[ed] to be malingering" and had Plaintiff sign a compliance contract. Id.

In August 2008, Plaintiff informed Counselor Bianco that she had enrolled in a graduate degree program at D'Youville College. T.412. In January 2009, Plaintiff reported that she had passed three of her graduate courses there. T.420. Over time, Counselor Bianco's indicate that Plaintiff was gaining some degree of insight into her problems, although she continued to struggle with attendance at her appointments.

Plaintiff was seen by Hong Rak Choe, M.D., her treating psychiatrist at Lake Shore Behavioral Health, for medication management every few weeks. T.318-42. Dr. Choe observed that Plaintiff was consistently cooperative, fully oriented, with good recent and remote memory skills. Plaintiff's affect and mood were appropriate though guarded. Dr. Choe described her thought content as both appropriate and paranoid. Plaintiff's thought process was intact with ideas of reference (believing that

---

[8]     It bears noting that on other occasions, Counselor Bianco noted that Plaintiff was disheveled and malodorous.

occurrences in the outside world were directed personally at her). Dr. Choe's diagnoses were major depressive disorder and post-traumatic stress disorder ("PTSD") on Axis I, and a GAF score of 55 on Axis V. T.320.

In support of Plaintiff's disability application, and at her attorney's request, Simon Szimonisz, M.D. completed a medical source statement on March 23, 2009. T.271-76. Dr. Szimonisz assessed that Plaintiff could lift ten pounds frequently and twenty pounds occasionally. Plaintiff could sit, stand, and/or walk for at least six hours each during the course of an eight-hour. T.271-72. Due to her psychiatric medications, Plaintiff was advised to avoid moving machinery. Based upon her asthma, Dr. Szimonisz recommended avoiding dust, fumes, humidity, and chemicals in the workplace. Dr. Szimonisz imposed no restrictions on reaching, fingering, handling, feeling, pushing/pulling, seeing, hearing, or speaking.  T.274.

Jeffrey Kashin, M.D., one of Dr. Choe's associates at Lake Shore Behavioral Health, completed a mental residual functional capacity ("RFC") questionnaire on March 25, 2009, at the request of Plaintiff's attorney. T.278-82. On Axis I, Dr. Kashin diagnosed Plaintiff with PTSD[9] and a major depressive

---

[9]

    The ALJ, in his decision, attributes Plaintiff's PTSD to "past military service". T.20. However, treatment notes from multiple providers indicate that Plaintiff's PTSD is the result of physical abuse she suffered at both the hands of her mother and one of her husbands.

disorder; on Axis II, he indicated that Plaintiff's GAF score was 56. T.278. Regarding Plaintiff's ability to do work-related activities on a day-to-day basis in a regular work-setting, Dr. Kashin assessed that Plaintiff could satisfactorily understand, remember, and carry out detailed directions; maintain attention for a two-hour segment; and sustain an ordinary routine without special supervision. T.280-81. However, according to Dr. Kashin, Plaintiff had a less than satisfactory ability to remember work-like procedures, maintain regular attendance, work in coordination with others, make simple work-related decisions, ask simple questions or request assistance, accept instructions or respond appropriately to criticism from supervisors, respond appropriately to changes in a routine work setting, deal with the stress of skilled or semi-skilled work, interact appropriately with the general public, and use public transportation. Dr. Kashin opined that Plaintiff was not able to meet competitive standards for completing a normal work-week without interruptions from psychologically-based symptoms, was not able to get along with co-workers or peers, was not able to deal with normal work stress, and was not able to maintain socially appropriate behavior. He opined that Plaintiff's impairment would last at least twelve months and would cause her  to be absent from work more than four days per month. T.282.

The last treatment note from Lake Shore Behavioral Health in the administrative record is dated May 6, 2009. Counselor Bianco wrote that Plaintiff had been compliant with medication but still was "very stressed" with a depressed and tearful affect. T.426. Counselor Bianco and Plaintiff discussed how her mental health was affecting her physical health and vice versa. Plaintiff was to return in a month, once her medical issues (a sprained ankle and intestinal blockage) had resolved. Id.

## IV.  The ALJ's Decision

The Act authorizes payment of disability insurance benefits to individuals with "disabilities." "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Second Circuit has summarized the five-step sequential evaluation used in determining disability claims as follows:

> "[I]f the Commissioner determines (1) that the claimant is not working, (2) that [s]he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in [her] prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social

12

> Security Administration bears the burden on the last
> step.

Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)
(quoting Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002));
Shaw v. Chater, 221 F.3d 126, 132 (2d Cir.2000) (internal
citations omitted).

Here, the ALJ followed the required five-step analysis, see
20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v), for
evaluating disability claims. At the first three steps of the
sequential evaluation, the ALJ found that Plaintiff had not
engaged in SGA since she filed her SSI application, and that
while her hepatitis B, depression, and learning disorder were
"severe" impairments, they were not of Listing-level severity.
T.15-16. See 20 C.F.R. §416.920(b)-(d); 20 C.F.R. Part 404,
Subpart P, Appendix 1.

Prior to proceeding to the fourth step, the ALJ assessed
Plaintiff's RFC and determined that she retained the ability to
perform work at all exertional levels, but that should avoid
concentrated exposure to conditions that would exacerbate her
asthma. T.16. As far as any mental limitations on her RFC, the
ALJ determined that Plaintiff could understand, follow, and carry
out simple instructions and perform simple tasks; and could
maintain attention and concentration for extended periods as to
simple tasks. Id. However, she was moderately limited in her

ability to maintain attention and concentration with regard to detailed tasks. Id. The ALJ indicated that Plaintiff should avoid operating hazardous machinery, but did not give a rationale for this limitation. Id.

At the fourth step, the ALJ found that Plaintiff had "past relevant work in customer service while in the Army"[10] and "[a]ccordingly, [she] is unable to perform past relevant work." T.21.

At the fifth step, the ALJ found that Plaintiff was a "younger individual" on the date the application was filed; has a high school education and can communicate in English; and transferability of skills was not material to the determination of disability. T.21. The ALJ found that considering Plaintiff's age, education, work experience, and RFC, there are jobs existing in significant numbers in the national economy that Plaintiff can perform. Id. The ALJ noted since Plaintiff has only non-exertional limitations, Section 204.00 in the Medical-Vocational Guidelines ("the Grids") provided a framework for decision-making. Id. (citation omitted). Although Plaintiff's ability to perform work has been compromised by her non-exertional limitations, the ALJ found that they had "little to no effect on the occupational base of unskilled work at all exertional levels"

---

[10]    It appears that the ALJ has misread the record. Plaintiff's employment history indicates that Plaintiff worked at a call center from 1994 to 2006, doing customer service and "enrolling people into AARP and [M]edicare prescription drugs." T.102.

and therefore a finding of "not disabled" under the Grids, Section 204.00, was appropriate. Id.

## V.   General Legal Principles

A decision that a claimant is not disabled must be affirmed if it is supported by substantial evidence, and if the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); see also, e.g., Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the district court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

This deferential standard is not applied to the Commissioner's conclusions of law, however. Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). The district court must independently determine whether the Commissioner's decision applied the correct legal standards in determining that the claimant was not disabled. "Failure to apply the correct legal standards is grounds for reversal." Id. Therefore, this Court first reviews whether the applicable legal standards were correctly applied, and, if so, then considers the substantiality of the evidence. Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987). The Commissioner's determination will not be upheld if it is based on an erroneous view of the law that fails to consider

highly probative evidence. <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999). In such cases, the reviewing court has the authority to reverse with or without remand. <u>See</u> 42 U.S.C. §§ 405(g), 1383(c)(3).

## VI.  Discussion

Plaintiff argues that the ALJ erred in the following ways: (1) he failed to properly evaluate whether Plaintiff meets the criteria in Listing 12.05C; (2) he failed to properly evaluate the opinions of Plaintiff's treating psychiatrists; (3) he accorded undue weight to the opinion of a non-examining state agency disability review consultant; (4) he failed to provide any discussion as to the weight given to the opinion of the consultative psychologist; and (5) he erroneously relied solely on the Grids without consulting a vocational expert.

### A.   Erroneous Analysis Under Listing 12.05C

Listing 12.05 states, in relevant part as follows:

Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning *initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22*.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> . . .

> C.  *A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental*

    *impairment* imposing an additional and significant work-related limitation of function;

      . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 (emphases supplied).

Without analysis, the ALJ found that Plaintiff does not have a "[qualifying] IQ [score] . . . and a physical or other mental impairment imposing an additional and significant work-related limitation of function." T.16. The ALJ stated that "[a] review of the medical evidence does not establish the presence of a physical impairment that would impose the necessary limitations needed to meet this requirement. . . ." Id.

The ALJ did not address the first aspect of 12.05C—namely, whether, before age 22, Plaintiff demonstrated significantly subaverage general intellectual functioning with deficits in adaptive functioning. There is evidence in the record to support a finding that Plaintiff had a significant learning disability in secondary school. In particular, her secondary school records from indicate that she failed several classes. Although Plaintiff claimed to have graduated from BSC with a four-year degree and had passed three out of four graduate level classes at D'Youville College, consultative psychologist Dr. Ryan found these assertions dubious and noted "inconsistencies" in her educational and work history.

Turning to the IQ scores required to meet Listing 12.05C, the ALJ ignored Dr. Ryan's intelligence testing, which indicated that Plaintiff achieved IQ scores clearly within the range set forth in Listing 12.05C—i.e., a verbal IQ of 69, a performance IQ of 64, and a full scale IQ of 64. T.168. Defendant argues that although the numerical IQ scores were within the applicable range, the "validity of the scores is questionable" because Dr. Ryan noted that while her test scores "indicated deficient functioning, . . . [she] put forth only minimal effort on the test[.]" Defendants' Reply ("Reply") at 4 (citing T.168). It is true that Dr. Ryan somewhat inconsistently noted that her test "[r]esults are considered valid and reliable, but minimal estimates of her abilities." T.167 (emphasis supplied). Dr. Ryan also opined that "her depression interfered to some degree." Id. The ALJ did not request clarification from Dr. Ryan regarding this aspect of his report; nor did he provide any rationale for rejecting the IQ scores reported Dr. Ryan. Defendant's suggested post hoc rationalizations are not entitled to weight by a reviewing court. See Demera v. Astrue, No. 12-CV-432 (FB), 2013 WL 391006, at *3 n.3 (E.D.N.Y. Jan. 24, 2013) ("The Commissioner attempts to justify the ALJ's determinations by noting that Dr. Karpe's opinion was inconsistent with the record evidence and that Dr. Vosseller's opinion was conclusory on an issue reserved for the Commissioner. The ALJ did not provide these explanations,

however, and <u>post hoc</u> rationalizations for the ALJ's decision are
not entitled to any weight.") (citing <u>Snell v. Apfel</u>, 177 F.3d
128, 134 (2d Cir. 1999) ("A reviewing court 'may not accept
appellate counsel's post hoc rationalizations for agency
action.'") (quoting <u>Burlington   Truck   Lines,   Inc.   v.
United States</u>, 371 U.S. 156, 168 (1962))).

Finally, the ALJ did not fully address whether Plaintiff
meets the last element of Listing 12.05C, a "physical *or* other
mental impairment imposing an additional and significant work-
related limitation of function[.]" 20 C.F.R. Pt. 404, Subpt. P,
App., Listing 12.05C (emphasis supplied). He simply stated that
the medical evidence did not support a finding of a *physical*
impairment that caused work-related limitation of function but
ignored the substantial evidence in the record that Plaintiff has
a mental impairment—major depressive disorder—that causes
significant work-related functional limitations.

"The Second Circuit has yet to answer the question of what
test should be utilized in determining whether, with respect to
the second requirement of 12.05(C), a claimant's 'physical or
other mental impairment' other than his or her low IQ imposes a
significant work-related limitation[,]" <u>Keitt   v.   Barnhart</u>,
04-CV-1347(FB), 2005 WL 1258918, at *4 (E.D.N.Y. May 27, 2005),
and other circuit courts are divided on this issue, <u>id.</u>

(collecting cases). The First, Eighth and Tenth Circuits have taken the approach that the additional limitation in Listing 12.05C is "significant" if the claimant suffers from an additional physical or other mental impairment that is "severe," as that term is defined at step two of the sequential analysis. See Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997); Warren v. Shalala, 29 F.3d 1287, 1291 (8th Cir. 1994); Nieves v. Secretary of Health and Human Servs., 775 F.2d 12, 14 (1st Cir. 1985). This requirement is not demanding, for as the Second Circuit has held, the step two severity test "may do no more than screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). The Eleventh Circuit has rejected the severity test for purposes Listing 12.05C, holding instead that impairments, in addition to low IQ, meet that section's second requirement if they impose a limitation of function that is more than de minimis but less than severe. See Edwards v. Heckler, 755 F.2d 1513 (11th Cir. 1985).[11] The Fourth Circuit has applied a more rigorous standard, concluding that a claimant is significantly limited within the meaning of Listing 12.05C only when it is shown that she cannot perform his or her prior relevant work. See Flowers v. United States Dep't of Health and Human Servs., 904 F.2d 211, 214 (4th Cir. 1990).

---

[11]     Because the step-two severity test functions simply to screen de minimis claims, see Dixon, 54 F.3d at 1030, arguably it is impossible for a claimant to have a limitation that is more than de minimis but not "severe" for purposes of step two. Keitts, supra.

Although ALJ's decision did not expressly articulate which of these tests it was applying, it appears to be similar to that adopted by the Fourth Circuit, since the ALJ based his determination on whether, in light of her past history of work and capacity to carry out activities of daily living, Plaintiff was able to perform substantial gainful employment. However, district courts in this circuit have followed the approach taken by the First, Eighth and Tenth Circuits. Keitts, supra (citing Aviles v. Barnhart, 2004 WL 1146055 (E.D.N.Y. May 11, 2004); Baneky v. Apfel, 997 F. Supp. 543 (S.D.N.Y. 1998); Velezquez v. Chater, 1996 WL 107109 (W.D.N.Y. Mar. 6, 1996)). This Court agrees that the correct standard for determining whether an impairment, in addition to low IQ, imposes a "significant" work-related limitation under Listing 12.05C is the step two severity test. The actual wording of the second prong of Section 12.05(c), "a physical or other mental impairment imposing additional and significant work-related limitations of function," is essentially the same as that of the step two severity definition (whether the claimant has "any impairment(s) which significantly limits [his or her] physical or mental ability to do basic work activities"). Baneky v. Apfel, 997 F. Supp. 543.

"[A] contrary interpretation would be inconsistent with" Listing 12.05C, which "essentially provides that those

individuals with IQ's in the range of 60 through 70 may be found disabled upon a showing that they have an additional limitation that imposes a significant limitation on their ability to work." Id. However, if "significant" requires a greater degree of limitation than "severity," "there would be little point in having a special category for those with limited IQ's." Id. Moreover, if the "additional" limitation in Listing 12.05C must satisfy a higher standard than step two "severity", then a qualifying "additional" limitation "often would be sufficient in its own right to support a finding of disability, rendering [Listing] 12.05(c)'s provisions for those with low IQ's superfluous." Baneky, 997 F. Supp at 546 (alterations in original; internal footnotes omitted); accord, Keitts, 2005 WL 1258918, at *6.

Thus, in analyzing the significance of Plaintiff's limitations (other than her low IQ), based upon her ability to resume work, rather than based upon the step two severity test, the ALJ misapplied the law of this Circuit. Keitts, 2005 WL 1258918, at *6. Accordingly, the Court cannot determine whether or not the Commissioner's ultimate conclusion that Plaintiff was not disabled is supported by substantial evidence. See Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal

principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.").

Nonetheless, this is not a situation "[w]here application of the correct legal standard could lead to only one conclusion. . . . ." <u>Id.</u>  The Court finds that remand, rather than reversal for calculation of benefits, is required because the entire analysis of Listing 12.05C was flawed and requires further development of the record. In particular, there are ambiguities in Dr. Ryan's report regarding the validity of Plaintiff's IQ scores. A remand is required so that the ALJ can re-contact Dr. Ryan and request an explanation of Plaintiff's test scores and a further opinion on Plaintiff's level of intellectual functioning. In addition, the ALJ misapplied the law in his analysis of the remaining elements of Listing 12.05C. Remand likewise is required for the ALJ to apply the correct legal principles to the facts of Plaintiff's claim.

### B. Errors In Assessing Plaintiff's RFC

Plaintiff argues that the ALJ's RFC assessment is flawed in several ways: (1) he failed to properly evaluate the opinions of Dr. Kashin, one of Plaintiff's treating psychiatrists; (2) he accorded undue weight to the opinion of Dr. Tzetzo, the non-

examining state agency disability review consultant; and (3) he failed to provide any discussion as to the weight given to the opinion of the consultative psychologist, Dr. Ryan.

The "treating physician rule" instructs the ALJ to give controlling weight to the opinions of a claimant's treating physician, as long as the opinion is well-supported by medical findings and is not inconsistent with the other evidence in the record. 20 C.F.R. § 404.1527(c)(2). The ALJ cannot discount a treating physician's opinion unless it "lack[s] support or [is] internally inconsistent." Snell v. Apfel, 177 F.3d at 133. Furthermore, the ALJ may not "arbitrarily substitute his own judgment for competent medical opinion." Balasmo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (citation omitted).

Controlling weight is given to a "treating source's opinion on the issue(s) of the nature and severity" of a claimant's impairment(s) if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); see also Rosa v. Callahan, 168 F.3d 72, 78–79 (2d Cir. 1999). However, not all health care providers are treating sources. According to the regulations, a treating source is a claimant's "own physician, psychologist, or other acceptable medical source" who provides or has provided "medical treatment or evaluation and who has, or has had, an ongoing treatment

relationship" with the claimant. 20 C.F.R. § 404.1502. Pursuant to the regulations, an "ongoing treatment relationship" is generally found where an acceptable medical source treats a claimant "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." Id.

Here, the ALJ discounted the medical source statement given by Dr. Kashin, a psychiatrist at Lake Shore Behavioral Health, where Plaintiff has been seen on a regular basis from February 2008. Defendant notes that there are no treatment notes from Dr. Kashin in the medical records; the only treatment notes were authored by his associate, Dr. Choe, who saw Plaintiff on a regular basis. Thus, Dr. Choe's notes provide a "detailed, longitudinal picture," 20 C.F.R. § 404.1527(c)(2), of Plaintiff's impairments and resultant limitations. Dr. Choe, however, apparently was not requested to fill out a medical source statement.

Nevertheless, Dr. Kashin's opinion is largely supported by and consistent with Dr. Choe's treatment notes, as well as Counselor Bianco's notes and consultative psychologist Dr. Ryan's report. Dr. Kashin found that Plaintiff could not complete a normal workday and workweek without interruptions from psychologically based symptoms. This is borne out by Plaintiff's consistent difficulty in attending her psychiatric and counseling

appointments due to the symptoms from her major depressive disorder and PTSD. "Under [SSR 96-7p], . . . an ALJ must not draw an adverse inference from a claimant's failure to seek or pursue treatment "without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." McGregor v. Commissioner of Soc. Sec., 10-CV-1483 TJM/VEB, 2012 WL 2873559, at *10 (N.D.N.Y. June 1, 2012). Courts in this Circuit have found that "faulting a person with diagnosed mental illnesses (which caused, inter alia, delusions, anxiety, depression, poor insight and judgment) for failing to pursue mental health treatment is a 'questionable practice.'" McGregor, 2012 WL 2873559, at *10 (quoting Day v. Astrue, No. 07 CV 157, 2008 WL 63285, at *5 n. 6 (E.D.N.Y. Jan. 3, 2008) (noting that it "is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation") (quoting Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996); citing Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989))).

Dr. Kashin also stated that Plaintiff could not perform at a consistent pace without an unreasonable number and length of rest periods. This is consistent with consultative psychologist Dr. Ryan's observation that Plaintiff was "extremely slow paced" in performing "clinical tasks recording speed and accuracy" and

when presented with a two-step problem, stated, "I can't [do it]." T.168.

Dr. Kashin determined that Plaintiff was unable to meet competitive standards in maintaining socially appropriate behavior or in adhering to basic standards of neatness. This mirrors the observations by Plaintiff's counselors that she occasionally appeared at appointments disheveled, malodorous, and inappropriately dressed. Dr. Kashin determined that Plaintiff was seriously limited in interacting appropriately with the general public; similarly, Dr. Ryan opined that Plaintiff has difficulty dealing with others and dealing with stress. Importantly, state agency review psychiatrist Dr. Tzetzo—whose opinion the ALJ gave great weight—also opined that Plaintiff requires a job with low contact with the public.

Although the ALJ was not required to accept any single opinion—even that of a treating physician—as dispositive of the disability determination, the ALJ was obligated to explain why he chose not to give controlling weight to Plaintiff's treating physician's opinion. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Snell, 177 F.3d at 133-34. Where, as here, the ALJ elects not to give a treating physician's opinion controlling weight, the Second Circuit has stated that the ALJ "must consider" the factors articulated in 20 C.F.R. § 404.1527(c)(2). Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008). The ALJ

failed to do either in this case, however. Remand accordingly is warranted. See Cabassa v. Astrue, No. 11-CV-1449 (KAM), 2012 WL 2202951, at *8 (E.D.N.Y. June 13, 2012) (remanding where ALJ only made conclusory statements that treating physician's opinion was inconsistent with treatment notes objective findings and did not explain his reasons for giving opinion "little weight"; ALJ failed to specify which the "treatment notes or any objective findings" that were inconsistent with treating physician's opinion); Lopez-Tiru v. Astrue, No. 09-CV1638(ARR), 2011 WL 1748515 (E.D.N.Y. May 5, 2011) (remanding case where ALJ failed to give controlling weight to treating physician's opinion "after making several conclusory statements").

The Court turns next to disability analysist Dr. Tzetzo's opinion. Dr. Tzetzo found that Plaintiff had no significant limitations in completing a normal work week without interruptions from psychologically-based symptoms; and had only mild limitations in getting along with co-workers, maintaining socially appropriate behaviors, and responding appropriately to changes in the work-setting. These opinions are contradicted by the contemporaneous clinical observations of Plaintiff's treating healthcare providers regarding her appearance and demeanor. Notably, Dr. Tzetzo's report was based only upon his review of the record; he did not conduct an examination of Plaintiff.

Although the ALJ stated that he gave the most weight to Dr. Tzetzo's opinion, it is apparent that he rejected some of Dr. Tzetzo's findings without explanation. "While the ALJ is not obligated to 'reconcile explicitly every conflicting shred of medical testimony,' [s]he cannot simply selectively choose evidence in the record that supports his conclusions." Gecevic v. Secretary of Health and Human Servs., 882 F. Supp. 278, 286 (E.D.N.Y. 1995) (quoting Fiorella v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983)). In particular, Dr. Tzetzo found that Plaintiff would be "moderately limited" in a number of areas: the ability to work in coordination with or proximity to others without be distracted by them, the ability to interact appropriately with the general public, and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, the ability to respond appropriately to changes in the work setting, and the ability to set realistic goals or make plans independently of others. T.231-32. The ALJ ignored all of these limitations in formulating his RFC. HE gave no explanation as to why he discounted this aspect of Dr. Tzetzo's opinion and only adopted the conclusion that Plaintiff was capable of unskilled work. These additional limitations found by Dr. Tzetzko, which are well-supported by the medical record and by other providers'

opinions, significantly erode Plaintiff's occupational base. The type of selective analysis undertaken here by the ALJ was plainly improper, and remand is required. E.g., Rodriguez v. Astrue, 12-CV-4103(JG), 2013 WL 1282363, at *16 (E.D.N.Y. Mar. 28, 2013); Fuller v. Astrue, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

Finally, with regard to consultative psychologist Dr. Ryan, the ALJ failed to discuss his opinion or explain the weight, if any, accorded to it. This is further error requiring remand. See Schultz v. Astrue, 04-CV-1369 (NAM/RFT), 2008 WL 728925, at *10 (N.D.N.Y. Mar. 18, 2008) (remanding where it was "unclear what specific evidence the ALJ relied upon in determining the extent of plaintiff's mental health impairments" and "ALJ failed to explain or address the weight given to any of the medical opinions of treating or examining physicians and consultants") (citing SSR 96-6p ("Administrative law judges . . . must explain the weight given to these opinions in their decision.").

### C. Other Errors: Evaluation of Plaintiff's Credibility and Failure to Call a Vocational Expert

As the Court has already determined sufficient bases exist for ordering the matter remanded, the Court need not determine whether Plaintiff's other alleged errors warrant remand. However, the Court will briefly address the other errors asserted by Plaintiff so that they may be avoided on remand.

Plaintiff faults the ALJ for concluding that her statements concerning the intensity, persistence and limiting effects of her symptoms were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." It is erroneous for an ALJ to find a claimant's statements not fully credible because those statements are inconsistent with the ALJ's own RFC finding. See, e.g., Nelson v. Astrue, No. 5:09-CV-00909, 2010 WL 3522304, at *6 (N.D.N.Y. Aug. 12, 2010) (recommending remand for, inter alia, a proper analysis of Plaintiff's credibility as "the propriety of the ALJ's finding that Plaintiff was credible only to the extent that her statements were consistent with his own RFC determination is questionable"), report and recommendation adopted, 2010 WL 3522302 (N.D.N.Y. Sept. 1, 2010). Instead, SSR 96-7p requires that "[i]n determining the credibility of the individual's statements, the adjudicator must consider the entire case record." SSR 96-7p, 1996 WL 374186, at *1. Therefore, the Court agrees with Plaintiff that the ALJ erred in the present case by measuring Plaintiff's credibility only by assessing the consistency of her statements with the ALJ's own RFC finding, instead of evaluating all of the required factors bearing on Plaintiff's credibility prior to deciding Plaintiff's RFC.

With regard to the failure to call a vocational expert, Plaintiff notes that the ALJ found that she could not perform her

past work as a customer service representative. However, the ALJ provided no rationale for this conclusion, and there is no vocational information available regarding that job title because no vocational expert was engaged.

Furthermore, the ALJ not only found that Plaintiff had the "severe" impairments of depression and a learning disability, he concluded that these impairments cause "significant limitation" in her ability to do basic work activities. T.15. At the same, however, the ALJ found that exclusive reliance on the Grids was appropriate because Plaintiff's impairments had "little or no effect on the occupational base of unskilled work at all exertional levels." T.21. As Plaintiff points out, this clearly contradicts the ALJ's earlier finding that she was "significant[ly]" limited by her depression and learning disability in performing basic work activities. The ALJ's decision is thus internally inconsistent. See Clark v. Barnhart, 02-CV-4626(FB), 2003 WL 22139777, at *2 (E.D.N.Y. Sept. 16, 2003) ("Because of the inconsistent findings by the ALJ, remand is required for a definitive determination as to whether [the claimant] is or is not disabled. . . .").

Moreover, relying solely on the Grids at step five is inappropriate where, as here, a claimant has "significant nonexertional impairments that limit the range of . . . work that the claimant can perform. . . ." Rosa v. Callahan, 168 F.3d 72,

78 (2d Cir. 1999); see also Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004).

### D. Appropriate Remedy

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of record, a judgment affirming, modifying or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate where there are gaps in the record or further development of the evidence is needed. E.g., Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980). In addition, failure to satisfy the treating physician rule constitutes legal error, and ordinarily requires remand to the ALJ for consideration of the improperly excluded evidence. Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (citations omitted). Finally, the other errors identified by the Court above warrant remand.

### VII.   Conclusion

For the reasons set forth above, this Court finds that the Commissioner's decision to deny benefits to the Plaintiff was flawed by several legal errors requiring remand for further administrative proceedings. Therefore, Plaintiff's motion for judgment on the pleadings is granted to the extent stated above. The Commissioner's motion for judgment on the pleadings is denied. The matter is remanded for further administrative

proceedings consistent with this Decision and Order, as explained more fully above.

**ALL OF THE ABOVE IS SO ORDERED.**


S/Michael A. Telesca
_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:      September 30, 2013
            Rochester, New York